A06A2344. SIMMONS v. THE STATE.
(644 SE2d 434)

PHIPPS, Judge.

Mona Simmons "a.k.a. Tyra Ro[d]gers a.k.a Tyron Rogers" was convicted of numerous offenses for her roles in defrauding a mortgage company, Cendant Mortgage, in connection with the sales of two houses, 890 Westmont Road and 1443 Beecher Street in Atlanta. Relative to the Westmont Road property, she was convicted of theft by taking money from Cendant, first degree forgery in connection with a loan application, and first degree forgery in connection with a signature/name affidavit. Relative to the Beecher Street property, she was convicted of theft by taking money from Cendant, identity fraud for unauthorized use of a social security number of another, first degree forgery in connection with a HUD-1 statement, and first degree forgery in connection with a signature/name affidavit.

On appeal, Simmons contends that the evidence was insufficient to support one of her theft by taking convictions and that the trial court erroneously ruled on a motion in limine and on her claim of ineffective assistance of counsel. For reasons that follow, we affirm.

*Westmont Road Property.* On November 13, 2003, the house at 890 Westmont Road, Atlanta was sold. At the closing, Jian Holley appeared as the seller; a woman appeared as the buyer, signing a signature/name affidavit certifying her name was "Tyron Rogers." The house was being financed by Cendant. The underlying loan

application, which contained information provided to the mortgage company by the applicant, showed the borrower's name as "Tyron Rogers"; the borrower's present residential address as "3461 Walnut Ridge, Atlanta GA 30349"; and the borrower's former residential address as "11050 Cedar Hills Blvd, Minnetonka MN 55305." The buyer initialed each page of the loan application.

The contract sales price was $280,000. Cendant disbursed that amount to its closing attorney's escrow account, having approved the loan application for "Tyron Rogers." From that disbursed amount, the attorney sent a $100,618.04 check to the seller, Holley; and a $5,850.15 check to the buyer, "Tyron Rogers." The attorney also disbursed $168,197.03 to a bank and later testified that this amount paid off a mortgage the seller had placed on the property being sold.

The $5,850.15 check made payable to "Tyron Rogers" was deposited into a bank account that carried a title and address of "B M 7671 Incorporated; 371 Boulevard, Suite D; Atlanta, GA 30312." The sole authorized signatory on that account was "Mona Simmons." The $100,618.04 check was deposited on the day of the closing in a bank account in the name of "TNM Investments," for which Holley was a signatory. Subsequently clearing that account were the following checks, which Holley signed and dated the day of the closing: (1) a $25,190.22 check payable to "B M 7671," (2) a $17,000 check payable to "Mona Simmons," and (3) an $8,000 check payable to "Mona Simmons."

A former Cendant employee testified that, around the time Cendant approved the loan applications submitted in connection with the Westmont Road and the Beecher Street properties, the mortgage company was located in New Jersey, had no offices or underwriters in Georgia, and commonly accepted information from loan applicants by telephone and documents they submitted. Regarding the Westmont Road property, the employee testified that a person representing herself as "Tyron Rogers" had applied for a loan. The applicant supplied various information, such as present and former residential addresses. In approving the amount of the loan, Cendant relied upon a $280,000 appraisal of the property by Keisha Bell, who had been chosen by "Rogers." After the closing, Cendant never received any payment on the loan, was unable to find "Tyron Rogers," and ultimately lost $218,141.52 on the loan.

Before and at trial, the closing attorney identified Simmons as the person who had appeared as "Tyron Rogers" at the closing. The state's expert on real estate appraising testified that, at the time of the closing, the property was worth $102,000. Indeed, only nine months before the closing, Holley purchased the property for $105,000.

*Beecher Street Property.* On April 7, 2004, the closing for the sale of the house at 1443 Beecher Street occurred. The underlying HUD-1

statement, which had been prepared by the closing attorney representing Cendant, listed the seller as the Milligan Family Trust and the buyer as "Tyra Rodgers." At the closing, Jeff Milligan appeared on behalf of the trust; and a woman appeared as the buyer, signing a signature/name affidavit that certified her name was "Tyra M. Rodgers." She also signed each page of the HUD-1 statement, certifying that "to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction."

The contract sales price on the HUD-1 statement was $320,000. Having approved a loan application for "Tyra Rodgers" for that amount, Cendant disbursed the funds to its closing attorney's escrow account. After various reductions, such as a $167,966.83 "payoff of first mortgage loan," the cash due to seller amounted to $138,767.66. The attorney prepared a check for that amount payable to the trust, but pursuant to Milligan's subsequent instruction, did not send it and instead wired $39,767.66 into a bank account owned by the trust. He wired the remainder, $99,000, into a bank account in the name of "R. P. Simmons." The day after the closing, the $99,000 posted to an account held by Simmons in the name of "Ramona Pitts-Simmons."

The former Cendant employee testified that a person representing herself as "Tyra Rodgers" had applied for a loan. The applicant supplied a present residential address of "11050 Cedar Hill Boulevard, Minnetonka, Minnesota," which, as was later discovered, was the same address "Tyron Rogers" had supplied as her former residential address in applying for a loan for the Westmont Road property. The applicant also supplied a social security number that belonged to a woman who testified that she did not know "Tyra Rodgers," did not know Simmons, had not authorized either to use her social security number, and had never heard of 1443 Beecher Street. In considering "Rodgers's" application, however, the mortgage company did not verify whether the social security number belonged to the applicant. In approving the amount of the loan, Cendant relied upon a $320,000 appraisal by Keisha Bell, who had been chosen by "Rodgers" and who had valued the property at $350,000. Cendant never received any payment on the loan, never located a "Tyron Rodgers," and ultimately lost $250,403.39 on the loan.

Before and at trial, Cendant's closing attorney identified Simmons as the woman who had represented herself at the closing as the buyer. At trial, the attorney further recalled that the woman told him during the closing that her first name was "Tyron," not "Tyra." The state's expert on real estate appraising testified that, at the time of the closing, the property was worth $132,000.

*Similar Transaction Evidence.* The state showed Simmons's participation in three other deals in which she received monies from

the sales of Georgia houses: (a) 348 Atlanta Avenue, Atlanta; (b) 495 Hopkins Street, Atlanta; and (c) 221 Mink Drive, Cataula.

*Atlanta Avenue.* In December 2001, Simmons purchased this property with funds received from a lender. The underlying HUD-1 statement showed a sales price of $268,000, from which $75,960 was disbursed for "unsecured loan pay off"; $7,000 for "landscaping"; and $30,000 for "home improvements." After various other reductions, the cash to seller amounted to $136,363.85.

No payment was ever made to the lender. An investigation into the matter ensued. The seller testified that she had sold her home, not for $268,000, as shown by the HUD-1 statement, but for $150,000. She further testified that, at the time she sold it, she had no outstanding loans and had done no landscaping or any other improvement to the residence.

Execution of a search warrant upon the law firm of the attorney who handled the closing yielded an "invoice" stating that "PBS & Associates" had extended an $81,000 "personal loan" to the seller in 1999. The address shown on the document housed Platinum Beauty Supply, where Simmons was found working. The disbursement of $75,960 was traced to a bank account under the names "Platinum Beauty Supply" and "Mona Simmons." Contrary to what was indicated by the "invoice," county business records showed that "Platinum Beauty Supply" was not in existence in 1999 or in 2001, when the loan closed. And the seller testified that, at the time of the closing, she had no knowledge of a "PBS & Associates" or a "Platinum Beauty Supply."

In connection with this real estate transaction, arrest warrants were issued for Simmons, the person who ultimately received the "landscaping" money, and the person who ultimately received the "home improvement" money, Edwin Moffett. After her arrest, Simmons admitted that she had received money out of the deal and claimed that Moffett had masterminded the mortgage scam. For her involvement in this matter, Simmons pled guilty to one count of theft by deception.

*Hopkins Street.* In August 2004, Cendant lent Denise Diamond $330,000 to purchase this property. In applying for the loan, Diamond supplied the mortgage company with a residential address of "11050 Cedar Hills Boulevard, Minnetonka, Minnesota" (the same address that "Tyron Rogers" and "Tyra Rodgers" supplied to Cendant); and a previous residential address of "3645 Market Place Boulevard, East Point, Georgia." As an asset, Diamond claimed ownership of funds in a certain bank account, a claim Cendant did not confirm with the bank. After the closing, Cendant received no payment on the loan. An investigation into this matter showed that the bank account Diamond had designated as hers actually belonged to Simmons. As of

trial, Cendant was anticipating a $158,654.01 loss on the loan, having placed the house for sale at what it believed was its market value.

*Mink Drive.* In February 2004, Cendant disbursed a $309,028.57 loan to Simmons in the name of "Ramona Simmons" to purchase 221 Mink Drive at a sales price of $312,000. As her identification, Simmons had provided to Cendant a copy of a Georgia driver's license issued in the name "Ramona Pitts-Simmons." Cendant received payments on the loan only through December 2004; and at the time of the trial, the property was in foreclosure.

*Additional state's evidence.* To corroborate various evidence of Simmons's guilt, the state presented evidence of her use of a mailbox. The owner of a UPS Store pointed to Simmons as the woman who had come into his store in October 2003 and applied for a mailbox in the name of "Mona Simmons" with a company name "PBS & Associates/HC Inc." at "371 Blvd." As identification, she presented a Georgia driver's license issued in the name "Yasmin Mona Simmons" and authorized to be placed in her mailbox items addressed to that name and other names, such as "T. Rogers," "M. Simmons," and "PBS and Associates." The mailbox she was assigned carried a mailing address of "3645 Market Place Boulevard, Suite PMB[1]-130,[2] East Point, Georgia, 30344." Later, Simmons added as a recipient of mail items the name "Denise Diamond," telling the UPS store owner that such person was her roommate. But after some time, Simmons removed from her mailbox the names "T. Rogers" and "Denise Diamond." She also called the UPS store owner from jail, requesting that he write letters to a detective, stating that (1) she had never pretended to be "T. Rogers" or "Denise Diamond" and that (2) she had never authorized to be placed in her mailbox items addressed to "T. Rogers" or to "Denise Diamond." The owner refused to do so.

The state also presented a cancelled check written on Simmons's "B M 7671" account to "Keisha R. Bell." It had been dated October 1, 2003, about six weeks prior to the closing of the Westmont Road property, and cleared that account about a week after it was dated.

*Simmons's defense.* Simmons denied that she was the buyer of the Westmont Road or the Beecher Street property. She also denied appearing at the closing for either property. She admitted, however, receiving in excess of $50,000 of the proceeds stemming from the Westmont Road property closing and approximately $99,000 of the proceeds stemming from the Beecher Street property closing. She

---

[1] "Personal Mail Box."
[2] Simmons was later assigned mailbox 143.

claimed that she had been a real estate investor and that the majority of such proceeds represented her profits for remodeling the properties.

Simmons testified that her first investment property had been the Atlanta Avenue house. She admitted that she had received money stemming from the closing of that property and thereafter pled guilty to theft by deception.

Simmons testified that she had met Diamond, also a real estate investor, at a mortgage seminar. Through Diamond, she had met Milligan. Simmons and Milligan thereafter collaborated in about ten real estate deals. Explaining her role in their ventures, Simmons testified, "[A]s an investor, I have nothing to do with the mortgage nor the property itself, other than the renovating, and we had kind of built up a rapport where if he submitted me an invoice for repair or receipts of anything of that nature, I trusted the fact that they were true and accurate."

According to Simmons, Milligan had approached her about the Hopkins Street property. She admitted taking part in that real estate venture and receiving approximately $80,000 of the proceeds stemming from the Hopkins Street property closing.

Simmons testified that she had learned of the Westmont Road property through another acquaintance of Diamond and that such acquaintance was the real estate broker representing the seller of that property, Holley. Simmons asserted that her own involvement in the Westmont property was limited to financing renovations and providing the earnest money and various closing costs. She explained that "B M 7671" was her "basic modeling" company and that she and her company had been paid from funds stemming from the closing.

Simmons testified that she had become aware of the Beecher Street property through Milligan and Diamond. She admitted receiving funds from that closing, which she claimed as her profit for repairing the property and providing the earnest money.

With respect to the Mink Drive property, Simmons testified that she had obtained a loan in February 2004 from Cendant to purchase that house, into which she moved as her residence. By the end of the year, however, a Cendant employee advised her that the mortgage company had "two different I.D.'s with [her] face on both copies." Explaining why the loan later went unpaid, Simmons testified that Cendant thereafter refused her loan payments, and months later, she received notice of foreclosure.

Simmons admitted that she had once lived at "3461 Walnut Ridge, Atlanta," which was the address supplied to Cendant by "Tyron Rogers." Simmons also admitted that she was familiar with the address "371 Boulevard" because she had rented space there for a business office and a beauty supply store. Simmons testified that,

in addition to "B M 7671," she had also owned "PBS," which she stated had "two entities": Platinum Beauty Supply and Platinum Building Services, the latter being a remodeling company. Regarding the check written to "Keisha Bell" on the account of B M 7671, Simmons testified that, although she had signed the $500 check for a real estate appraisal, she had left blank the payee line. Simmons claimed that she did not know Keisha Bell when the check was written.

Simmons explained the circumstances of renting the mailbox at the UPS Store. In 2001 and 2002, her home was repeatedly burglarized and items displaying her personal identification had been stolen. She became concerned about receiving mail at her residence and thus eventually opened the mailbox.

Later, she added "T. Rogers" to her mailbox because Milligan had told her that the purchaser of the Beecher Street property was moving to Atlanta from another state and "needed somewhere to get her mail received before she actually was living here in Atlanta." She testified that, in the Beecher Street transaction between Rodgers and the Milligan Family Trust, Milligan was acting on behalf of the seller, and therefore, "it would be a conflict of interest if [the purchaser] used his address." Simmons added "Denise Diamond" because Diamond was then living with her and she had advised Diamond that she did not want personal mail being sent to her home.

Simmons removed "T. Rogers" from her mailbox because she suspected "the person who [she] thought was 'T. Rogers' " of using her identification information. Simmons testified that she removed Diamond because "[s]he had introduced me to, supposedly, the T. Rogers and Mr. Milligan, and all the stuff that had kind of happened along the period of time, I just kind of start putting different things together and didn't want to have anything really to do with any of them anymore." Simmons testified that she also stopped doing business with Milligan because he was an acquaintance of Rogers and Diamond.

1. Simmons contends that the evidence was insufficient to support her conviction of theft by taking with respect to the Beecher Street property. The indictment charged that she had unlawfully taken from Cendant Mortgage approximately

$320,000.00, but in any event in an amount greater than five hundred dollars ($500.00), with the intention of depriving said owner of said property; said U. S. currency is further described as part of that currency transferred by and from Cendant Mortgage by check at the April 7th, 2004, real estate closing of the property located at 1443 Beecher Street, SW, Atlanta, Georgia.

Simmons points out that the evidence showed that she did not take possession of the funds by check, but by wire.

Nevertheless, the precise method of the transfer of property is not an element of the crime of theft by taking. Thus, the allegation concerning the method of funds transfer "was mere surplusage and need not have been proven."[3] Moreover,

> [o]ur courts have departed from an overly technical application of the fatal variance rule, focusing instead on materiality. The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to affect the substantial rights of the accused. It is the underlying reasons for the rule which must be served: 1) the allegations must definitely inform the accused as to the charges against him so as to enable him to present his defense and not to be taken by surprise, and 2) the allegations must be adequate to protect the accused against another prosecution for the same offense. Only if the allegations fail to meet these tests is the variance "fatal."[4]

Simmons was sufficiently informed to defend against the theft by taking charge proved, and the wording of the indictment with respect to this charge protects her from subsequent prosecutions for the offense charged. Accordingly, we reject her contention concerning the variance and hold the evidence was sufficient to satisfy the standard set forth in *Jackson v. Virginia*.[5]

2. Simmons complains of a ruling by the trial court barring her attorney from presenting what she claims was impeachment evidence concerning the closing attorney for the Beecher Street property. The state asserts that no such ruling was made, and Simmons has failed to cite any such ruling in the record. Consequently, we do not consider this complaint.[6]

3. Simmons contends that the trial court erred by rejecting her claim of ineffective assistance of counsel.

To prevail on such claim, a defendant must establish, pursuant to *Strickland v. Washington*,[7] that counsel's performance was deficient and that the deficient performance was prejudicial to his

---

[3] *Jackson v. State*, 267 Ga. 130, 131 (3) (475 SE2d 637) (1996) (citation and punctuation omitted).

[4] *Turner v. State*, 231 Ga. App. 747, 747-748 (1) (500 SE2d 628) (1998) (punctuation and footnotes omitted).

[5] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[6] See Court of Appeals Rule 25 (a) (1), (c) (3) (i).

[7] 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

defense.[8] A court addressing the ineffective assistance issue is not required to approach the inquiry in that order or even to address both components if the defendant has made an insufficient showing on one.[9] Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.[10] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review a trial court's legal conclusions de novo.[11]

Simmons contends her trial counsel performed deficiently by failing to show that the attorney representing Cendant at the Beecher Street closing had been arrested for participating in mortgage fraud. She claims that had the jury been told of his arrest, it might have found that his identification of her as the buyer at the closing was merely to curry favor with the state. But given the overwhelming evidence that Simmons committed the crimes for which she was found guilty, we find no reasonable probability that the outcome of her trial would have been different had the jury been told about the attorney's arrest.

*Judgment affirmed. Smith, P. J., and Ruffin, J., concur.*

DECIDED MARCH 27, 2007.

*Gerard B. Kleinrock*, for appellant.
*Gwendolyn Keyes Fleming, District Attorney, Daniel J. Quinn, Assistant District Attorney*, for appellee.

---

[8] See *Conaway v. State*, 277 Ga. 422, 424 (2) (589 SE2d 108) (2003).
[9] *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993).
[10] Id.
[11] *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000).